Filed 6/30/26  Vasile v. FAA Beverly Hills CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CHARLES VASILE, | B338580 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV02964) |
| v. | |
| FAA BEVERLY HILLS, INC., | |
| Defendant and Respondent. | |

Appeal from judgment of the Superior Court of Los Angeles County, Colin Leis, Judge.  Affirmed.

Barrington Legal, Inc., Eamon Jafari and Jacob R. Gould for Plaintiff and Appellant.

Manning, Leaver, Bruder & Berberich, Daniel F. Berberich and Timothy D. Robinett for Defendant and Respondent.

_____

In October 2018, Charles Vasile and his company, Vasile Properties Airport Plaza LLC, leased a car from FAA Beverly Hills Inc., doing business as Beverly Hills BMW (FAA).  Three months later, Vasile filed suit against FAA alleging the dealership had violated the Consumers Legal Remedies Act (Civ. Code,[1] § 1750 et seq.) (CLRA) by misrepresenting the monthly lease payment for the car.

Vasile claimed that, during negotiations, dealership representatives quoted him a monthly lease price of $786.48. He further claimed that when an FAA salesperson "delivered the vehicle, along with the requisite agreement for the transaction," the salesperson "represented that the terms contained in the agreement correctly reflected the terms originally presented to [Vasile]."  The written lease, however, provided for a total monthly payment of $815.45—an increase of $28.97 resulting from the addition of an optional maintenance package to the base lease terms.  Vasile initially claimed nearly $20,000 in damages.  Later, he reduced his claimed damages to $1,042.92, i.e., the total he paid for the maintenance package over the course of the 36-month lease.

At the January 2024 jury trial in the action, FAA argued that its personnel had accurately presented the lease terms and, alternatively, that Vasile had not relied on any purported misrepresentations.  In support, FAA presented evidence— including testimony from its finance manager and one of Vasile's former assistants—that Vasile orally agreed to the $815.45 monthly payment amount prior to signing the lease, that Vasile was a sophisticated businessperson who had executed more than

_____

[1] Unless otherwise specified, statutory references are to the Civil Code.

100 leases in the past, and that Vasile willfully had failed to honor the terms of certain prior leases.

Using a special verdict form approved by Vasile's counsel, the jury found that FAA had "represent[ed] that the lease agreement for [the car] had been supplied in accordance with a previous representation when it had not," in violation of the CLRA. (See § 1770, subd. (a)(16) [it is "unlawful" to "represent[ ] that the subject of a transaction has been supplied in accordance with a previous representation when it has not"].) But the jury further found that Vasile was not "harmed by [FAA's] representation." The trial court denied Vasile's posttrial motions challenging the verdict and entered judgment in favor of FAA.

Vasile now asks us to reverse, arguing that: (1) the special verdict form improperly "collapsed" the elements of harm and causation under the CLRA, (2) the court erred by allowing the parties to present argument in response to a jury note concerning the meaning of the term "representation," and (3) insufficient evidence supports the verdict in favor of FAA.

We, however, conclude that Vasile forfeited his challenges to the special verdict form and the response to the jury note by failing to object at trial. And we conclude that Vasile fails to demonstrate that the trial evidence compels a verdict in his favor as a matter of law. (See *Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708, 733 (*Eriksson*) [" '[w]hen the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals . . . the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law' "].)

Accordingly, we affirm.

3

## FACTUAL SUMMARY AND PROCEDURAL HISTORY

We summarize only the facts and procedural history relevant to our resolution of this appeal.

### A. Stipulated Facts

At the outset of the trial, the court read to the jury 56 stipulated facts identifying the key players involved in the lease transaction and the general timeline of relevant events:

Vasile, then a 65-year-old retired physician, visited the FAA dealership the morning of October 9, 2018 to discuss leasing a car. Vasile's two assistants, Victor Mora and Lacey Markel, accompanied him.

During the visit, Vasile spoke with salesperson Sanya Vujovic and sales manager Toufie Sarwan. Sarwan discussed with Vasile the possibility of leasing the vehicle for 36 months for a monthly payment of $723, as reflected in a worksheet Sarwan showed to Vasile. Once Vasile expressed interest in these terms, Sarwan asked for permission to run Vasile's credit "to determine whether he had premium tier credit to qualify for the [proposed] terms."

Sarwan determined that Vasile did not have the required credit, and the two therefore discussed an alternative option of Vasile co-leasing the vehicle with his company, Vasile Properties Airport Plaza LLC. Via another worksheet, Sarwan showed Vasile alternative lease terms, which included monthly payments of $781. Sarwan also agreed that FAA would paint the rims of the vehicle another color, free of charge. Vujovic provided Mora with her personal cell phone number so he could contact her concerning the car. Vasile then left the dealership sometime before 6:00 p.m.

At approximately 6:30 p.m. that evening, Vasile, using Mora's phone, called Vujovic on her personal cell phone and left a voicemail

4

in which he stated that he wanted to lease the car. Mora and Vujovic then exchanged a series of text messages over the next three days, all of which "were sent and received on behalf of Vasile with Vasile's authorization":

"[October 9, 2018, 6:49 p.m.]

"[Vujovic]: Hi. I got your voice mail. I'll call you back as soon as I can.

"[Mora]: Call me back tonight if you can. If not, call me tomorrow morning. We want to get the car tomorrow.

"[Vujovic]: Ok. Still here."

"[October 9, 2018, 9:48 p.m.]

"[Vujovic]: Can you guys come back on Thursday to get it? I'm off tomorrow. I will send you the structure tomorrow."

"[October 10, 2018, 8:35 a.m.]

"[Mora]: Good morning[, Vujovic]. We can come tomorrow to get the car. Please email the structure to [email address]. Does Dr. Vasile have to sign anything else?

"[Vujovic]: Good morning. Yes, he has to sign a lot of leasing paperwork, but we can do everything tomorrow. It shouldn't take long, though.

"[Mora]: Okay. What's the earliest time we can meet you tomorrow?

"[Vujovic]: What time works for you? 9:30 a.m.?

"[Mora]: I have to take [Vasile] to a doctor[']s appointment in Beverly Hills at 12:15 p.m. It will be in the morning before or afternoon after the appointment. I will find out and let you know.

"[Vujovic]: Sounds perfect."

"[October 10, 2018, 5:08 p.m.]

"[Mora]: Hi [Vujovic,] it's [Mora] again. I'm planning on seeing you tomorrow morning around 9:30 a.m.–10:30 a.m. Dr. Vasile wanted to know if you could just email or fax me the papers he has to sign so he doesn't have to come with me to get the car? Let me know. Also, please email the structure of payments to [email address] so I can prepare the check.

"[Vujovic]: No, he has to sign. But I can deliver the car with papers and [U]ber back. Would that work?

"[Mora]: If you could deliver the car here to Dr. Vasile's house, with the paper for him to sign, that would be perfect.

"[Vujovic]: Ok great. Can we do it then after his doctor's appointment tomorrow? Because I will need the finance guy to call him to go over paperwork. Actually the morning would work too but let me know.

"[Mora]: The morning would be best. What time could you be here in Marina Del Rey?

"[Vujovic]: 10:30?

"[Mora]: 10:30 a.m. is good. How long will it take to sign the papers with you and the finance guy?

"[Vujovic]: I came to work to get everything approved and figure it out. I'll have the finance guy call him either first thing in the morning or later today. Please send me the updated insurance card (not expired)."

"[October 10, 2018, 6:57 p.m.]

"[Vujovic]: [Photograph of lease deal structure] $2,598 drive off payment with tax $832.29 for 12K miles a year.

"[Mora]: Thanks. Please bring a copy of it tomorrow."

"[October 11, 2018, 8:56 a.m.]

"[Vujovic]: I might be a little late because I still need the finance guy to print out the documents. One of them comes in at 9.

6

"[Mora]: Okay. Dr. Vasile has a 12:15 p.m. appointment in Beverly Hills. So if we can finish everything by 11:30 a.m.– 11:45 a.m., it should be fine.

"[Vujovic]: Yes we'll definitely finish by then."

"[October 11, 2018, 9:39 a.m.]

"[Vujovic]: My finance guy wants to talk to you guys. Is it okay if he calls now at this number?

"[Mora]: Sure go ahead."

One of FAA's finance managers, Abir Nahar, then called Vasile, and they discussed the monthly payment amount for the lease. Vasile said the amount "sounded high." Nahar told Vasile that he would "discuss [the] concern about the monthly payment amount with the manager with whom Vasile had negotiated the deal, i.e., . . . Sarwan, and would get back to Vasile shortly."

Vujovic and Mora then engaged in a further text message exchange:

"[Vujovic]: The finance guy is calling the manager. The manager who gave [Vasile] the deal was off yesterday too.

"[Mora]: Okay. Dr. Vasile would like to speak to the office manager. Can you have him call this number?"

"[October 11, 2018, 9:55 a.m.]

"[Vujovic]: [Photograph of a finger pointing at text reading "$723"] That was the payment before they [ran] the credit and after that it went up. They are trying to figure it out. [Sarwan] (the manager who gave him the deal) says 832 sounds high too.

"[Mora]: Okay. Just let me know.

"[Vujovic]: Ok so they figure[d] it out[.] [I]t is 714.98 plus tax [equals] 786.48. What's your email[, Mora]?

"[Mora]: [Email address]. What time will you be here at the Marina?

7

"[Vujovic]:  Leaving now.  Eta 40 min.
"[Mora]:  See you soon.  Drive safe."

"[October 11, 2018, 11:24 a.m.]
"[Vujovic]:  3 min.
"[Mora]:  Okay."

At approximately 11:30 a.m. on October 11, Vujovic arrived at Vasile's home with the car and the lease paperwork.  Vujovic, Vasile, Mora, and Vasile's other assistant, Markel, were the only people present in the home at the time.  Vasile signed the lease agreement and related documents and provided Vujovic with a check for the down payment in the amount of $2,598.  After signing, "Vasile had a copy made of several pages of the subject written lease agreement and related documents."  Vujovic left Vasile's home before 12:11 p.m., "and Vasile left to go to his doctor['s] appointment as well."

On October 20, 2018, Vasile received the first account statement with respect to the lease.  The statement reflected a monthly payment amount of $815.45 due by November 10, 2018.  On October 29, 2018, at 10:16 a.m., Mora texted Vujovic:  "I'm trying to get ahold of the sales manager[,] Mr. Sarwan.  Dr. Vasile wants to talk to him."  Vujovic responded, "Hi, [Mora].  He gets in at noon.  [Phone number.]"  Mora replied, "Thanks.  I'll call when he gets in."

Finally, on November 1, 2019, Vujovic called Mora, but was unable to reach him.  Instead of answering the call, Mora texted Vujovic, "I can't talk right now.  I'll call you back shortly."

8

## B. Trial Testimony and Exhibits

### 1. *Vasile's Case*

During his case in chief, Vasile testified on his own behalf and presented excerpts from the deposition of his former assistant, Mora, who was not available to testify at trial.

#### a. *Vasile's testimony*

Initially, Vasile testified that when he spoke with the finance manager the morning the car was delivered, the finance manager told him the total monthly payment would be approximately $814 because of the optional maintenance package. Vasile said he told the finance manager, "I did not order a maintenance package," and "if he did that, I would not take the car." Later, however, Vasile testified that he and the finance manager "never spoke" of the optional maintenance package.

Vasile further testified that, when Vujovic arrived to deliver the car, she represented that the lease documents reflected the terms Vasile had negotiated with Sarwan, the sales manager, while at the dealership:

"[FAA's counsel]: When Sanya Vujovic brought the lease documents to your house, did she give you any assurance that the lease agreement reflected the monthly payment amount that you had agreed to?

"[Vasile]: Yeah. She—she—because I asked her, 'So do these documents reflect the deal that we made in the office?' And she said 'Yes.'

"[FAA's counsel]: And those were the exact words that you used when you—when you asked her that question?

"[Vasile]: The exact words, I don't remember the exact words, but she had all these papers. I didn't have a chance to—I couldn't read them in 15 minutes. It would take two days. So I said,

'Are these documents reflective of the deal that I made with Mr. Sarwan?' And she said, 'Yes.' "

Finally, Vasile testified that after he received the first statement reflecting the $815.45 monthly payment amount, he attempted to call Sarwan "many, many times" to discuss the price discrepancy and Sarwan "was always unavailable." He testified that, as a result, it took "four [or] five months" for him to understand the purported overcharge was the result of the optional maintenance package. Vasile further testified that, notwithstanding a demand letter from his attorney and the filing of the instant suit, the dealership "absolutely would not correct" the alleged error in the lease terms. Vasile nonetheless continued paying the full $815.45 due each month and paid "thousands of dollars in maintenance even though [FAA] tried to give it to [him] free every time [he] came in."

On cross-examination, FAA's counsel introduced Vasile's deposition testimony in which Vasile described his view of Vujovic as a "young" salesperson who "didn't know anything" about the lease terms:

"[Counsel[2]]: Did [Vujovic] say anything to you about what the monthly price of the lease was?

"[Vasile]: No. She was very, very, very young, and she was, like, a clerk, you know. Just a young girl that shows you the car. And I felt sorry for her.

"[Counsel]: Did you ask her to confirm if the monthly lease amount was correct?

"[Vasile]: I didn't ask her anything. She didn't know anything. She was just struggling with signing, looking for a place

---

[2] It is not clear from the record whether Vasile's counsel or FAA's counsel posed these questions at Vasile's deposition.

10

to sign on each piece of paper, trying to make sure she didn't miss a signature.

"[Counsel]: And other than telling you where to sign, she didn't tell you anything else about the lease agreement?

"[Vasile]: Didn't mention one thing."

Also on cross-examination, Vasile testified that he owns a property in Los Angeles consisting of between 40 and 50 commercial spaces for lease, and that he "[p]robably" has executed "[m]ore than 100" leases in the 25 years he has owned the property. And Vasile confirmed that, in addition to signing at the bottom of the FAA lease agreement, he had signed (1) the acknowledgement of his purchase of the optional maintenance package on page 3 of the lease, (2) an "Optional Products and Services Disclosure" reflecting that the $786.48 monthly base price of the lease would be increased to $815.45 in light of Vasile's purchase of the optional maintenance package,[3] and (3) a separate "BMW Full Maintenance Program Upgraded Agreement" confirming Vasile's purchase of the maintenance package and memorializing his right to cancel the package within 60 days for a full refund. Vasile testified that he never attempted to cancel the optional maintenance package "[b]ecause [he] never purchased it."

Finally, FAA introduced a copy of Vasile's declaration in opposition to FAA's motion for summary judgment. In the declaration, Vasile attested—contrary to his trial testimony—that

---

[3] Vasile signed the bottom of the "Optional Products and Services Disclosure" under an acknowledgment providing, in pertinent part: "[I] consent to including the above charges in the retail installment sales contract" for the vehicle. But as Vasile's counsel noted at trial, the form also contains boxes labeled "Accept" and "Decline" immediately adjacent to the maintenance package option. Vasile did not initial either of these boxes.

11

he had spoken with Sarwan over the phone on October 29, 2018, and that Sarwan had informed him that he "apparently [had] agreed to purchase an 'optional maintenance package[,]' . . . which increased the monthly lease payments . . . to $815.45." (Capitalization omitted.)

### b. *Mora's testimony*[4]

Mora testified that "[b]ased on [his] interactions and [his] observations that day at the time of the lease signing, to the best of [his] knowledge[,] . . . the written lease agreement that Dr. Vasile signed reflect[ed] the optional package that Dr. Vasile selected during the telephone call with [the dealership]." Mora further testified that, immediately after signing the lease, Vasile commented that he was "going to go after it" or "going to fix it," which Mora understood to mean Vasile intended to dispute the $815.45 monthly payment amount in the lease.

In addition, Mora testified that, after working for Vasile for more than 10 years, he had quit because he "wasn't getting paid correctly" and because of "physical and verbal abuse." Mora further testified that Vasile had behaved unethically in a variety of prior business dealings and legal proceedings: Vasile had asked Mora to lie in a deposition in a prior lawsuit. Vasile had failed to "hold up his end of the bargain with respect to . . . lease[s] [with his commercial tenants]" on "[m]ore than five" occasions. And Vasile had "acted in a dishonest manner" by presenting a signed lease in a

---

**4** Because the parties stipulated that the court reporter need not transcribe the reading of Mora's deposition excerpts, it is not always apparent from the record which party introduced each portion of his testimony. In the interest of simplicity, we summarize the entirety of Mora's pertinent testimony in our overview of Vasile's case in chief.

lawsuit with a Cuban restaurant. Mora explained: "[T]here was an issue over the lease. And the tenant that was there presented a lease that did not have a signature. . . . That he did not sign. But we presented a lease that had a signature on it."

Finally, Mora testified that "[i]f [Vasile] disagreed with a bill[,] he just wouldn't pay," that Vasile sometimes would use a wheelchair "to appear weak" to gain an advantage in business dealings, and that Vasile previously had sued Beverly Hills Rolls Royce.

### 2. *FAA's Case*

In its case in chief, FAA presented testimony from salesperson Vujovic, sales manager Sarwan, and finance manager Nahar. As set forth, *ante*, FAA also presented portions of Mora's deposition testimony.

### a. *Vujovic's testimony*

Vujovic testified, in pertinent part, that when she told Vasile at the dealership that his monthly payment would be higher due to his poor credit, "he stood up, which was kind of unusual, as . . . he was in a wheelchair, and he was upset, . . . and then he left." "So [she] told [her] manager there's nothing to do." Then, when Mora later contacted her and said Vasile wanted to lease the car, she "was trying to remember what was the final payment that we offered him." The approximately $832 monthly payment she initially texted Mora "was the number that was saved in the computer system" because "that was what the payment was supposed to be" before Sarwan "gave [Vasile] even more [of a] discount"—"probably . . . another 1,500 off [the standard pricing] to make [the deal] happen" "and made the payment [$]786.48."

She further testified that the lease agreement she provided to Vasile reflected that $786.48 monthly payment amount:

"[FAA's counsel]: And the—the—the number of $786.48—

"[Vujovic]: Yes, that is—that is the payment that we agreed on. And what I found out later, that's the actual number on the contract that I took.

"[FAA's counsel]: And is that the base amount before you add any additional optional products and services?

"[Vujovic]: Correct."

Vujovic also explained that she never texted Mora the $815.45 total monthly payment amount "because [the finance manager] told [her] that [Vasile] knows that he purchased the maintenance [package, a]nd he knows that the payment is going up because of it."

With respect to her oral representations to Vasile at the time he signed the lease, Vujovic provided contradictory testimony. She first testified that she was "100 percent sure" that she pointed out the optional maintenance package to Vasile. But she later testified that she could not recall precisely what she said to Vasile at the time he signed the lease documents:

"[FAA's counsel]: Did you make any promises to [Vasile] that this—these lease documents represent[ed] a deal that you previously agreed to?

"[Vujovic]: I mean, that was the—that was the deal that we agreed to. Honestly, I don't really remember what was said at the time. But, yeah, as I was going through the contract, I told him, 'This is the price that we agree[d] on and the payment.'"

In addition, Vasile's counsel introduced an excerpt from Vujovic's deposition in which she testified she "[did]n't remember" her conversation with Vasile at his home. Vasile's counsel also questioned Vujovic about a lease-related document bearing both Vasile's signature and a time stamp of 4:41 p.m. on October 11 (i.e., after Vujovic had left Vasile's home the day of signing). Vujovic,

14

however, testified she "never even noticed that there was a date stamp on that form," so she "wouldn't know" whether it referred to the time the document was printed, signed, or something else.

Finally, Vujovic testified that "there was no indication whatsoever that [Vasile] was ever unhappy," and that Vasile's assistant, Markel, invited her to dinner the day Vasile leased the car to "celebrate." She further testified: "[N]obody contacted me to complain; this maintenance or anything could have been canceled. Let's say he had buyer's remorse, for the love of God, call me and cancel."

### b.    *Sarwan's testimony*

Sarwan testified that he had a clear memory of Vasile because he was "an unusual person" and because of "his behavior[;] [h]e even got up and walked around from his wheelchair." Sarwan further testified that, while at the dealership, Vasile represented that he had good credit. Sarwan therefore presented initial lease terms based on that assumption. But once Sarwan ran Vasile's credit, he determined that Vasile did not qualify for premium tier pricing, and Vasile "got really upset." Vasile "made some comments like . . . dealerships, crooks, things like that. And then he . . . took himself out, and his assistants followed him." Vasile said, " 'I'm going to go to Long Beach BMW. I can get a car there. I'm not going to do business with you guys.' So he left." Later, however, Vasile returned and "at some point he ended up leasing the vehicle."

In addition, Sarwan testified that approximately one month after the transaction, Vasile called him on his extension: "He was really, really upset and irate actually on the phone, again, making allegations that we, basically, did something with the numbers, changed the numbers on him. The contract is not what it's supposed to be. And he was using foul language, using the

15

F word.  He was really upset on the phone.  I tried to calm him down to understand what he was talking about, but he was threatening, attorneys, 'I'm going to come after you guys.'  And at that point, I said, 'Dr. Vasile, I cannot have a conversation using . . . this type of language, and I'm going to hang up right now.'  And that's what I did."  Sarwan further testified that he never received the demand letter addressed to his attention that Vasile's attorneys purportedly sent via certified mail.[5]

### c.    *Nahar's testimony*

Finally, Nahar, the finance manager, testified in relevant part: "I just remember there was a transaction where the customer [didn't] sign at the dealership, so the salesperson brought me the paperwork.  I called the customer, went over the paperwork and the numbers.  If I can recall, he didn't agree to the payment.  So then I called the sales manager.  He then told me to let the customer know that his credit wasn't what it was supposed to be.  But then—and that's why the payment had gone to whatever it was.  Called the customer back.  He then remembered and agreed.  Then I proceeded with offering him . . . the additional protection plans.  The only one he bought was the maintenance.  He accepted the higher payment with the maintenance.  And that was the end of the call.  Got the paperwork together.  The salesperson took it, brought it back."

### C.    Jury Instructions, Deliberations, and Verdict

Vasile elected not to put on any rebuttal case.  Accordingly, after FAA rested, the court provided the jury with its instructions.  As to the elements of the CLRA claim, the court instructed the jury with Judicial Council of California Civil Jury Instruction No. 4700:

---

[5] The record does not contain any evidence that Sarwan ever signed for such a letter.

"To establish this claim, Charles Vasile must prove all of the following:

"1.  That Charles Vasile acquired, or sought to acquire, by purchase or lease, a 2018 BMW X5 for personal, family, or household purposes;

"2.  That [FAA] represented that the subject of a transaction had been supplied in accordance with a previous representation when it had not;

"3.  That Charles Vasile was harmed; and

"4.  That Charles Vasile's harm resulted from [FAA's] conduct.

"Charles Vasile's harm resulted from [FAA's] conduct if Charles Vasile relied on [FAA's] representation(s).  To prove reliance, Charles Vasile need only prove that the representation was a substantial factor in his decision.  Charles Vasile does not need to prove that it was the primary factor or the only factor in the decision.

"If [FAA's] representation of fact was material, reliance may be inferred.  A fact is material if a reasonable consumer would consider it important in deciding whether to buy or lease the goods."

In addition, the court provided the jury with a special verdict form expressly approved by Vasile, which provided in pertinent part:

"1.  Did Charles Vasile acquire, or seek to acquire, by lease, the 2018 BMW X5 vehicle for personal, family, or household purposes?

"_____Yes          _____No

"If your answer to question 1 is Yes, then answer questions 2 [*sic*].  If your answer to question 1 is No, stop here, have the presiding juror sign and date this form.

17

"2. Did [FAA] represent that the lease agreement for the 2018 BMW X5 vehicle had been supplied in accordance with a previous representation when it had not?

"____Yes      ____No

"If your answer to question 2 is Yes, then answer question 3. If your answer to question 2 is No, stop here, have the presiding juror sign and date this form.

"3. Was Charles Vasile harmed by [FAA's] representation?

"____Yes      ____No

"If your answer to question 3 is Yes, then answer question 4. If your answer to question 3 is No, stop here, have the presiding juror sign and date this form.

"4. Did Charles Vasile's harm result from [FAA's] conduct?

"____Yes      ____No

"If your answer to question 4 is Yes, then answer question 5. If your answer to question 4 is No, stop here, have the presiding juror sign and date this form."

The jury began deliberating the morning of January 19, 2024. At noon that day, the jury sent the following note to the court:

"Can we have clarification on what number two is asking? Specifically, what does representation mean? Also, does the 'when it had not' equate to a double negative? What is the 'it'?"

In response, the court advised the jury: "I received your question, and the attorneys and I have discussed your question.[6] And I have decided that the best way to answer the question you wrote down is for each attorney to have five minutes to—total to explain to you how that attorney believes you should interpret question 2 in order to answer question 2. [Vasile] will go first and

_____

[6] No transcript of this discussion appears in our appellate record.

then [FAA]. And then because [Vasile] has the burden of proof, [Vasile] will get the final word."

During his supplemental argument, Vasile's counsel told the jury, "[T]he synonyms for 'represent' include[ ] 'portray,' 'describe,' 'imply.' So did [FAA] portray that the lease agreement—or the terms of the lease agreement [are] the key here—had been provided in accordance with the previous representation about the terms when the lease agreement had not?" (Internal quotations corrected.)

FAA countered: "The word 'representation' is a fancy legal term that means to verbally tell somebody something. To make a statement to somebody. When you make a misrepresentation, that means to make a false or untrue statement. You also asked, what does the term 'it' at the end of the sentence mean? The word 'it' means the lease contract. Question No. 2 in the special verdict form is asking whether or not—it's asking essentially whether or not [FAA] misrepresented or made a false statement about the amount of the lease payment to Dr. Vasile at the time he signed the lease, contrary to all the other information and documents that Vasile signed showing the monthly payment amount and the inclusion of the optional maintenance package. [¶] . . . [¶] As you [will] recall, the monthly payment amount in the lease contract is $815.45. . . . Vasile claims that, at the time he signed the lease contract, Ms. Vujovic assured him that the lease contract reflected the terms he originally agreed to. [¶] . . . [¶] . . . The question is essentially asking whether or not Ms. Vujovic told . . . Vasile at the time of the lease signing that the total monthly lease payment was 786 instead of the higher amount of 815."

Vasile's counsel did not object to FAA's argument, but insisted in rebuttal that FAA's definition of "representation" was "not accurate." "Representation," Vasile's counsel argued, "doesn't mean

19

a verbal statement. . . . Representation can include anything. . . . Clearly, [Vujovic's] delivery and the paperwork for [Vasile] to sign was representing that [these are] the lease terms that were provided previously even if [Vujovic] said nothing. . . . [¶] . . . [¶] . . . So the answer to no. 2 should—it's a 'yes.'  Pretty simple.  That's the entire case."

Later that afternoon, the jury returned its verdict.  The jury unanimously answered "yes" to question 1, i.e., whether Vasile sought to acquire the vehicle for personal purposes.  As to question 2—whether FAA represented "that the lease . . . had been supplied in accordance with a previous representation when it had not"—the jury found in favor of Vasile, with 9 of the 12 jurors answering the question "yes."  Finally, in response to question 3, the jury unanimously found that Vasile was not "harmed by [FAA's] representation."  Consistent with the instructions set forth in the special verdict form, the jury did not answer question 4 (or any further questions) posed in the form.

The trial court denied Vasile's posttrial motions and entered judgment in favor of FAA.

Vasile timely appealed.

## DISCUSSION

### A.     Vasile Forfeited His Challenge to the Special Verdict Form

Vasile contends we must reverse the judgment because "the special verdict illegally conflated 'harm' with causation" and "likely misled the jury."  (Boldface & capitalization omitted.)  We, however, conclude that Vasile forfeited his challenge by approving the allegedly defective form and then failing to raise any challenge to the form before the court discharged the jury.  (See *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1093, fn. 6

(*Zagami*) ["[a]lthough inconsistent jury findings in a special verdict are not subject to waiver by a party [citation], if the *form* of a verdict is defective, the complaining party must object or risk waiver on appeal of any such defect"].)

Vasile insists we nonetheless must review his challenge because "the form misstated the law by collapsing elements" and "the legal accuracy of instructions/verdict forms . . . remains reviewable notwithstanding a party's acquiescence." (Boldface omitted.)  But Vasile cites no authority supporting that a special verdict form misstates the law by including an inquiry concerning two elements of a claim in a single question.  (Cf. Code Civ. Proc., § 624 [defining a special verdict as "that by which the jury finds the facts only, leaving the judgment to the court," and requiring only that "those conclusions of fact . . . be so presented as that nothing shall remain to the court but to draw from them conclusions of law" (capitalization omitted)].)  Instead, the cases on which Vasile relies either involve internally inconsistent findings in a special verdict or fail to analyze a special verdict form at all.  (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 (*Soule*) [no analysis of special verdict form]; *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1203 [no analysis of special verdict form]; *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 868, fn. 14 [expressly declining to address the plaintiff's challenge to the special verdict form], disapproved on another ground in *People ex rel. Garcia-Brower v. Kolla's Inc.* (2023) 14 Cal.5th 719, 734; *Zagami, supra,* 160 Cal.App.4th at p. 1092 [involving inconsistent responses on a special verdict form valuing a skiploader at both $15,500 and $30,000]; *Mendoza v.  Club Car, Inc.* (2000) 81 Cal.App.4th 287, 303 [involving internally inconsistent responses on special verdict form].)

21

Further, as FAA persuasively argues, some appellate courts have rejected similar challenges to special verdict forms. (See *J.P. v. Carlsbad Unified School Dist.* (2014) 232 Cal.App.4th 323, 338 [rejecting argument that the trial "court erred by failing to include separate questions on each element of equitable estoppel in the special verdict form submitted to the jury"]; see also *Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 364–365 [no prejudicial error where special verdict form failed to address the defenses of impossibility or impracticability of performance].)

Vasile insists that FAA's authorities are distinguishable because those cases did not involve any failure by the jury to render a finding on an *element* of a claim; rather, "th[ose] courts approved verdict forms that did not separately ask about every subsidiary evidentiary matter or defense." And Vasile urges that here, in contrast, because the jury failed to reach question 4 in the special verdict form, it failed to make any finding on causation—a required element of a CLRA claim. But the face of the form belies Vasile's argument. In responding to question 3—"Was Charles Vasile harmed *by* [*FAA's*] *representation*?"—the jury necessarily made a finding that FAA's representation did not cause Vasile any harm. (Italics added.)

We therefore conclude that Vasile has forfeited any challenge to the special verdict form.

## B. Vasile's Challenge to the Jury Note Response Fails

Vasile contends the court violated Code of Civil Procedure section 614[7] and committed reversible error by permitting the parties to present further argument in response to the jury's note seeking clarification as to the meaning of the term "representation." FAA counters that Vasile forfeited any challenge to the court's response to the jury note, and that any error in the court's response was harmless. We agree with FAA.

Although our appellate record contains no transcript of the court's discussion of the jury note with counsel for the parties, Vasile does not dispute FAA's assertion that he "affirmatively agreed to" the supplemental argument procedure the court proposed in response to the note. Vasile therefore forfeited any challenge to the procedure on appeal. (See *People v. Rogers* (2006) 39 Cal.4th 826, 877 (*Rogers*) ["counsel's acquiescence in the trial court's response [to the jury's question] forfeits the claim of error on appeal"].)

Further, Vasile fails to demonstrate any prejudice resulting from the response. (See *Soule, supra*, 8 Cal.4th at p. 574 ["A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a

---

[7] Code of Civil Procedure section 614 provides: "After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed of any point of law arising in the cause, they may require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the parties or counsel." (Code Civ. Proc., § 614, capitalization omitted.)

'miscarriage of justice.' [Citation.]  When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached"].) Vasile identifies no misstatements of law in the parties' supplemental arguments.  Nor does he posit an alternative response to the note the court might have supplied.  (See *Rogers*, *supra*, 39 Cal.4th at p. 877 [noting defendant's failure to "identify any respect in which the standard instruction could have been improved upon"].)  And he ignores that the jury found in his favor on the issue of whether FAA made a misrepresentation with respect to the lease agreement.

Accordingly, Vasile fails to demonstrate any reversible error by the court in responding to the jury's note.

### C.     Vasile Fails To Demonstrate the Trial Record Compels a Judgment in His Favor

Finally, we reject Vasile's argument that insufficient evidence supports the jury's verdict.

Preliminarily, Vasile fails to acknowledge that the substantial evidence standard of review "takes on a unique formulation" in the circumstances present here.  (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.)  " '[W]hen the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals . . . the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' " (*Eriksson*, *supra*, 233 Cal.App.4th at p. 733.)  We therefore review the record

to determine whether the evidence compels a judgment in Vasile's favor. (See *Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099.)

Vasile fails to satisfy the heavy burden imposed by this standard. (See *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486 ["[w]here, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor"].) Vasile argues that the "paper delta" between the $786.48 base price quoted in Vujovic's text and the $815.45 total monthly payment on the face of the lease conclusively establishes he suffered harm. But he makes no attempt to demonstrate that the record compels a finding in his favor on causation. Rather, Vasile merely reiterates his contention that the jury made no causation finding—a contention squarely refuted by the face of the special verdict form (see Discussion *ante*, part A). And our own examination of the record reveals substantial evidence—including testimony from Mora, Nahar, and Vasile himself—from which the jury could conclude that Vasile did not rely on any misrepresentation by FAA. We therefore conclude Vasile has failed to meet the stringent appellate burden of establishing that a verdict in his favor is compelled as a matter of law.[8]

Accordingly, we affirm.

---

[8] In light of our conclusion, we need not address the parties' dispute concerning whether the demand letter Vasile's counsel purportedly sent to Sarwan satisfies the notice requirements the CLRA establishes as a prerequisite for a damages award. (See § 1782.)

25

**DISPOSITION**

The judgment is affirmed.  Respondent is awarded its costs on appeal.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

WEINGART, J.